UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

                                                  :

In re:                                           :

                                           :

SOUNDVIEW ELITE, LTD.,            :

                                           :

                           Debtor.   :

-----------------------------------------------------:

ALPHONSE FLETCHER, JR., GEORGE E.  :
LADNER, SOUNDVIEW COMPOSITE LTD., :
RICHCOURT USA, INC., and FLOYD     :
SAUNDERS,

                                   :

                      Appellants,  :

                                   :

                  v.                    :

                                   :

CORINNE BALL, as Chapter 11 Trustee for :
Soundview Elite, Ltd.,

                                   :

                      Appellee.   :

-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 23, 2016

15 Civ. 5666 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

       The instant appeal arises from an order dated June 16, 2015, from the United States Bankruptcy Court for the Southern District of New York (Gerber, *J.*), granting Appellee Corinne Ball's motion for civil contempt sanctions against Appellants Alphonse Fletcher, Jr., George E. Ladner, Soundview Composite Ltd., Richcourt USA, Inc., and Floyd Saunders. In broad summary, sanctions were imposed after Appellants caused the Bankruptcy Court to release $100,000 in heretofore-frozen funds for certain specified purposes; used a portion the funds for other purposes; and then delayed in providing

information ordered by the Bankruptcy Court and returning the misspent funds.  For the reasons set forth in the remainder of this Opinion, the Court dismisses the appeal as to the party-Appellant, Soundview Composite Ltd., for lack of jurisdiction.  As to the remaining Appellants, the Court affirms the Bankruptcy Court's June 16 Order, and denies Appellants' appeal.

**BACKGROUND**[1]

### A.    Factual Background

### 1.    The Parties to the Appeal

Soundview Elite is a mutual fund, registered in the Cayman Islands as an exempted open-ended investment company.  (Desig. 1 at 3).  Soundview Elite is controlled by majority shareholder Soundview Capital Management Ltd. ("SCM").  (*Id.*).  SCM, in turn, owned the voting shares of Appellant Soundview Composite Ltd. ("Soundview Composite") and acted as its investment manager. (*Id.* at 4).  SCM is indirectly owned in part by Fletcher Asset Management, Inc. ("FAM"), an investment adviser owned, controlled, and operated by Appellant Alphonse Fletcher, Jr. ("Fletcher").  (*Id.*).  Fletcher and Appellant George Ladner are the co-directors of both Soundview Composite and SCM.  (*Id.*).

Appellant Richcourt USA, Inc. ("Richcourt") is a company directed by Fletcher that has no other employees.  (Counter-Desig. 8 at ¶¶ 7-8).  Richcourt provided administrative services for funds held by Soundview Composite.  (*Id.*).

---

[1]    The facts in this Opinion are drawn from Appellants' designated items for record on appeal (Dkt. #5), referred to as "Desig.," and Appellee's counter-designated items  (Dkt. #6), referred to as "Counter-Desig."  *See* Fed. R. Bankr. P. 8009.  For convenience, Appellants' brief in support of their appeal is referred to as "Appellant Br."; Appellee's brief in opposition as "Appellee Opp."; and Appellants' reply as "Appellant Reply."

2

Appellant George Saunders serves as corporate secretary for Soundview Composite and general counsel for SCM.  (Desig. 9 at 16:1-3; Desig. 15 at Ex. 6).

In 2013, Soundview Elite filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York.[2]  In January 2014, the Joint Official Liquidators (the "JOLs") for Soundview Elite filed an emergency motion seeking a temporary restraining order (the "TRO") freezing approximately $3.875 million that Soundview Composite maintained in an account at Wilmington Trust Company (the "Wilmington Account"). (Counter-Desig. 41 at 6).  During the TRO hearing, at which Soundview Composite did not appear, the Bankruptcy Judge ordered the Wilmington Account be frozen in order to "maintain the status quo" pending his ruling on the JOLs' motion to stay the bankruptcy court proceedings.  (*Id.* at 6-7).  The JOLs' motion to stay was subsequently denied.  (*Id.*).

In April 2014, Corinne Ball, Soundview Elite's Chapter 11 Trustee (the "Trustee"), instituted an adversary proceeding against Soundview Composite. (Desig. 1 at 16).  The Trustee's complaint explained the reasons for the adversary proceeding as follows:

> The narrow issue before the Bankruptcy Court today is the failure of Soundview Composite (a non-Debtor entity that, upon information and belief, is still controlled by Fletcher) to honor its contractual obligation to redeem the H Shares purchased by Debtor Soundview Elite and to return to Soundview Elite, at least, the approximate $3.8 million dollars held in the Wilmington Trust

---

[2]    The case was originally assigned to United States Bankruptcy Judge Robert E. Gerber, and was subsequently reassigned to United States Bankruptcy Judge Cecelia G. Morris.

> account of Soundview Composite as well as other
> Soundview Composite cash and non-cash assets
> possibly owed to Debtor Soundview Elite.

(Desig. 1 at ¶ 14).  Soundview Composite was initially represented in this

proceeding by attorney Peter M. Levine.  (*See* Desig. 3 at 3:13-18).

### 2.    The August 8 Hearing

In the context of his representation of Soundview Composite, Levine sent

a letter to the Bankruptcy Court on August 5, 2014, requesting a conference to

discuss three specific issues: (i) the release of funds from the frozen Wilmington

Account for "the payment of an additional retainer to cover [Levine's] fees";

(ii) the release of funds for "the payment of a retainer to the law firm Sher

Tremonte LLP," and (iii) "the authority of [the Bankruptcy Court] to control the

disbursement of funds from [the Wilmington Account]."  (Desig. 7 at 1).  The

retainer to Sher Tremonte was necessary to allow that firm to represent SCM,

Soundview Composite's investment manager, in an SEC investigation; and

while Soundview Composite was not itself subject to that investigation, it was

required to indemnify SCM for the cost of complying with the SEC's subpoena.

(*Id.* at 2).

Pursuant to Levine's request, the Bankruptcy Court held a conference to

discuss these issues on August 8, 2014, at which the Trustee, Levine, Fletcher,

and Saunders were present.  (Desig. 9 at 3:8-4:12, 9:13).  Judge Gerber opened

the August 8 conference by stating that "we're here on the conference

requested by Mr. Levine vis-à-vis additional draws from Soundview Composite

for what I believe were the two specific purposes he was talking about: one for

Sher Tremonte for assistance in connection with a subpoena to Fletcher Asset Management, and also his own fees." (*Id.* at 5:4-8).  Levine clarified for the Bankruptcy Court that SCM "has been served with a subpoena.  And the only fund with cash to pay counsel is Composite['s Wilmington Account]." (*Id.* at 14:16-18).

The Bankruptcy Court asked whether Levine was "looking for [the Court] to authorize Composite money to be used just for [Sher] Tremonte, or also [to] pay guys like Ladner or others to perform services associated with complying with the SEC obligation?," to which Levine answered: "I will limit the request to what's in [the August 5] letter." (Desig. 9 at 17:3-8).  In discussing that request with opposing counsel (i.e., counsel for the Trustee), the Court clarified that the request sought "[$]50,000 for Mr. Levine," and "[$]50,000 for Sher Tremonte," for a "total of [$]100 … [$]50,000 for each[.]" (*Id.* at 28:9-15).  None of the parties present contested this characterization of Levine's request.

In response to opposing counsel's objection to using Wilmington Account funds to pay Sher Tremonte's retainer in relation to the investigation of SCM — an investigation to which Soundview Composite itself was not a party — Levine argued that Soundview Composite's "indemnifying [its] investment manager for the expenses incurred in complying with the subpoena" was a "proper subject for [] reserve" of funds from any future redemption.  (Desig. 9 at 30:10-12).  Opposing counsel then observed that SCM had a claim of approximately $100,000 against Soundview Composite, and that perhaps SCM's claim could

be paid out in order to alleviate concerns about using Wilmington Account funds to pay SCM's costs in complying with the SEC.  (*Id.* at 33:22-34:1).

In ruling on Levine's requests regarding the disbursement of Wilmington Account funds, the Bankruptcy Court noted that the effort to divert Soundview Composite funds to pay for SCM's SEC counsel "ha[d] all the markings of a breach of fiduciary duty in progress," as it presented "an effort to use Composite funds to deal with needs and concerns of other entities in the Fletcher family" without observing any corporate formalities.  (Desig. 9 at 37:20-38:2).  After expressing further concerns, the Court nevertheless went on to state that opposing counsel had consented to releasing the valid $100,000 claim against Composite from the injunction, and that the "money could be used and should be used to pay the legal expenses, that are under discussion here, to meet the SEC's legitimate investigatory needs."  (*Id.* at 38:20-25).  Judge Gerber further stated that he had "no objection to paying Mr. Levine from that 100,000 dollars for work he previously did, so long as it's understood that this is a credit against amounts that would otherwise be on account of the obligations for which they're being paid."  (*Id.* at 38:25-39:4).

In addition to ruling on Levine's disbursement requests, the Bankruptcy Court heard argument on Levine's contention that that court lacked the authority to impose a freeze on the Wilmington Account.  (Desig. 9 at 29:10-22).  Judge Gerber acknowledged Levine's concerns, but ultimately held that the freeze was, for the time being, properly instituted and maintained.  (*Id.* at 35:17-23).  At the conclusion of the conference, the Bankruptcy Court so-

ordered the record, as neither party requested a written order.  (*Id.* at 39:12-19).

### 3. The Disbursement of Funds Following the August 8 Conference

On August 13, 2014, $100,000 was disbursed from the Wilmington Account to Richcourt.  (Desig. 15 at Ex. 2).  On August 26, 2014, Levine sent a letter to the Bankruptcy Court stating that he had not yet received payment of his fees and requesting: (i) to be relieved as Soundview Composite's counsel, (ii) an order directing payment of the $50,000 pursuant to his retainer agreement with Soundview Composite and the Court's August 8 Order, and (iii) an order directing "[Soundview] Composite or Richcourt to return the balance of the funds to Wilmington Trust or to use the balance to retain SEC counsel."  (Desig. 10).  Fletcher, in his capacity as director of Soundview Composite, responded on September 2, 2014, excerpting correspondence between Soundview Composite and Levine, and representing that SEC counsel had in fact been retained for SCM.  (Desig. 13).[3]  Levine followed up with a letter on September 3, 2014, reiterating his August 26 requests and disclosing the full exchange of communications from which Fletcher had excerpted, in light of the fact that Fletcher had waived any attorney-client privilege through his own prior disclosure.  (Desig. 12; *see also* Desig. 14 at 16:18-25).[4]

---

[3]    The excerpts suggested that Fletcher had asked Levine to obtain clarification of Judge Gerber's August 8 Order, and that Levine had responded by threatening to disparage Appellants to the Bankruptcy Court.  (Desig. 13).

[4]    The full email thread suggested that no genuine confusion existed regarding the Bankruptcy Court's August 8 Order; rather, Appellants expressed to Levine their objection to "acquies[cing] []to control of [their] affairs" by the Bankruptcy Court, due to the "consensus that the Court ha[d] exceeded its jurisdiction."  (Desig. 12).

### 4.     The September 3 and September 23 Orders

In response to Levine's August 26 letter, the Bankruptcy Court convened a conference on September 3, 2014, at which the Trustee, Levine, Fletcher, and Ladner were present.  (Desig. 14 at 3:8-5:4).  Here, too, Judge Gerber began the conference by framing the issues for discussion, this time noting that he had authorized a disbursement of funds from the Wilmington Account "for a particular purpose or two purposes"; he then demanded answers as to (i) why Fletcher had not reported the retainer of Sher Tremonte sooner, and had failed in his letter to inform the Court of the amount paid to Sher Tremonte; and (ii) why the money "authorized to be disbursed from [the Wilmington Account] for a particular purpose [was used] as [Fletcher's] personal pocket spending money."  (*Id.* at 7:17-8:10).

After hearing extensively from the parties, Judge Gerber pressed Fletcher specifically concerning the whereabouts of the $100,000 disbursed to Richcourt.  (Desig. 14 at 36:23-39:21).  Fletcher ultimately admitted that $15,000 had been used to post bonds on behalf of himself and another Fletcher-entity insider, Stewart Turner, in an unrelated proceeding before United States District Judge William H. Pauley III; $25,000 had been paid as a retainer to Sher Tremonte; and that the remaining $60,000 had been used in part to pay "directors' fees, accounting fees, and other ordinary expenses of the Soundview Richcourt group."  (*Id.*).  To clarify Fletcher's answer, which was given only after a series of evasive responses to the Court's questions, Judge Gerber asked, "Do I correctly understand you to have just [told] me that some

8

of that money that came out of the [$]100,000 was used to pay your affiliates or you personally?," to which Fletcher answered, "That is correct." (*Id.* at 39:24-40:2).

Following the revelation of the funds' use, in part, to pay insiders — which rendered prescient Judge Gerber's prior concerns about a "breach of fiduciary duty in progress" — the Bankruptcy Court ordered Fletcher to produce, by 5:00 p.m. on September 5, 2014, "a check-by-check, wire transfer-by-wire transfer, accounting of every payment that went into Richcourt from Wilmington Trust and out of Richcourt" following the initial disbursement of the $100,000. (Desig. 14 at 40:13-16, 45:11-12). The Court further granted Levine's requests (i) to be relieved as counsel for Soundview Composite, (ii) that Composite or Richcourt be ordered to pay the fee owed to him, and (iii) that any remaining funds from the $100,000 disbursement be returned to the Wilmington Account. (*Id.* at 46:6-17).

In support of these rulings, the Bankruptcy Court found, "as a fact or mixed question of fact and law[,] that there was nothing ambiguous, what[so]ever, with respect to [its August 8] order." (Desig. 14 at 46:23-24). To the contrary, that order had made clear "that the money could be used for only two purposes: [i] to pay Mr. Levine's fees; and [ii] to pay a retainer on account of services to the [Sher] Tremonte firm, for the purpose of addressing the SEC's regulatory needs and responding to its subpoena." (*Id.* at 47:2-5). The Court found that counsel for Soundview Elite had consented to the $100,000 disbursement "to be used for two purposes." (*Id.* at 49:1-2). It further found,

9

"as a fact," that Fletcher "should have known" the purposes for which the disbursement had been authorized.  (*Id.* at 49:14-15, 18-19).

At the close of the hearing, the Bankruptcy Court stated that "for the avoidance of doubt," it would so-order the record that day, but that it "want[ed] a written order to supersede it." (Desig. 14 at 52:11-13).  To that end, Judge Gerber requested Levine to draft a proposed order, to be circulated to counsel for the Trustee and endorsed by the Court.  (*Id.* at 52:13-16).

On September 4, 2014, Fletcher provided an accounting of the payments into and out of Richcourt since Richcourt's receipt of funds from the Wilmington Account.  (Desig. 15 at Ex. 2).  This accounting, less than one page in length, provided the date and amount of each transfer, as well as a cursory description of the transaction — for example, one line reads "8/28/2014 Payroll (9,300.00)." (*Id.*).  The September 4 accounting fails to specify the matters for which expenditures were made, the entities for which directors' or officers' fees were paid, or the payees to whom the checks were written.

On September 8, 2014, Levine submitted a proposed order, pursuant to Judge Gerber's instructions at the September 3 conference, requiring that

> Richcourt or Alphonse Fletcher, Jr. or both shall within two days of the entry of this Order supplement the list of expenditures provided by Alphonse Fletcher, Jr. on September 4, 2014, with the following information:
>
> (a) the name of the payee on each check issued by Richcourt,
> (b) the invoice against which each expenditure was made,
> (c) the matter for which each expenditure was made,

> > (d) the name of each person included in the payroll paid on August 28, 2014 and the name of each person's employer,
> > (e) Richcourt's bank records for the period August 1 through September 2, 2014.

(Desig. 15 at Part 2).  The proposed order additionally required Soundview Composite, Richcourt, or both, to "provide objective evidence of the purported $25,000 payment to the [Sher] Tremonte firm," and to return to the Wilmington Account "the difference between $50,000 and the amount of the actual payment to the [Sher] Tremonte firm," within "two days of the entry of this Order."  (*Id.*).  The Bankruptcy Court endorsed Levine's proposed order in its entirety on August 23, 2014.  (*See* Desig. 19).

### 5.    The Trustee's Motion for Civil Contempt

The Trustee subsequently filed a motion on September 26, 2014, seeking to hold Soundview Composite, Richcourt, Fletcher, Ladner, and Saunders in civil contempt of the Bankruptcy Court's August 8, September 3, and September 23 Orders.  (Counter-Desig. 20; Counter-Desig. 21 at 6-7).[5] Specifically, the Trustee argued that Appellants had acted in clear contempt of the Bankruptcy Court's August 8 Order by failing to use the $100,000 disbursement as the Court had ordered, and that they violated the September 3 and 23 Orders by (i) failing to pay the $50,000 in legal fees owed to Levine, (ii) failing to return the money not used to retain Sher Tremonte to the

---

[5]     The Trustee's contempt motion initially sought sanctions against Stewart Turner as well.  (*See* Desig. 20 at 6).  However, the Trustee later reached a settlement agreement with Turner, pursuant to which the Trustee withdrew her contempt motion against him. (*See* Desig. 27 at 10:13-19).

Wilmington Account, and (iii) failing to add the required supplementary information to Fletcher's previously-produced accounting.  (*Id.* at 2).

On October 30, 2014, the Trustee sent a letter to the Bankruptcy Court stating that "Fletcher Asset Management, an entity owned and controlled by Mr. Fletcher and other Respondents … ha[d] made a payment of $10,000" to the Wilmington Account; that the $15,000 used to post bonds on behalf of Fletcher and Turner in the proceeding before Judge Pauley had likewise been returned; and that Levine had been paid the fees owed to him.  (Desig. 26 at 1). The Trustee nonetheless asserted its intention to pursue its motion for civil contempt, citing Appellants' delayed compliance with the Bankruptcy Court's orders and their continued failure to produce evidence of the $25,000 payment to Sher Tremonte or the accounting information required by the September 23 Order.  (*Id.* at 1-2).

The Bankruptcy Court held a hearing on the Trustee's contempt motion on November 5, 2014.  (*See* Desig. 27).  The Trustee was present, as were counsel for Appellants, Robert Knuts, and Appellants Levine, Fletcher, and Ladner.  (*Id.* at 3:6-5:22).  At the conference, Knuts admitted that at least $75,000 of the $100,000 disbursed from the Wilmington Account had not been "disbursed *as per the discussion that was held on August 8th* until relatively recently."  (*Id.* at 32:21-33:5 (emphasis added)).  After hearing from the parties, the Bankruptcy Judge found each of the Appellants in contempt, "though with slightly different remedies for each."  (*Id.* at 54:8-10).  In support of his ruling, Judge Gerber made the following findings of fact:

- "In the parties' submissions to the Court, and at the August 8th, 2014 conference that underlies the motion for contempt, the only potential disbursements that were presented for [the Court's] consideration were two forms of legal expenses: [i] 50,000 dollars to Mr. Levine, and, [ii] up to 50,000 dollars as a retainer for the Sher Tremonte firm." (Desig. 27 at 55:4-9).

- In reliance on Judge Gerber's August 8 ruling, Wilmington Trust had wired $100,000 into Richcourt's account.  (*Id.* at 56:12-14).

- On August 13, 2014, Richcourt issued two $7,500 checks, one on behalf of Turner and one on behalf of Fletcher, "in satisfaction of their obligations under an order made by Judge Pauley," neither of which had been authorized by the Bankruptcy Court.  (*Id.* at 56:19-22).

- On August 14, 2014, Richcourt made five payments, each of $5,000, to Fletcher and other Composite and Richcourt insiders, none of which had been authorized by the Bankruptcy Court.  (*Id.* at 57:1-7).

- From August 15, 2014, to September 2, 2014, Richcourt made a series of payments ranging in amount from $350 to $10,000 to undisclosed recipients, none of which had been authorized by the Bankruptcy Court.  (*Id.* at 57:8-58:23).

- As the Bankruptcy Court had previously stated at the September 3 hearing, Fletcher "should have known" that the disbursed funds were not to be used for purposes other than the two requested by Levine.  (*Id.* at 59:3-13).

- "[I]n all material respects," there was — and continued to be — a failure to comply with the September 23 Order's requirement that supplemental accounting information be provided.  (*Id.* at 59:6-8).

Proceeding to the legal conclusions, Judge Gerber noted that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." (Desig. 27 at 60:19-23 (citing *Celotex Corp.* v.

*Edwards*, 514 U.S. 300, 306 (1995))).  He further found that "the failures to comply with the [September 23 Order] and the delays associated with the order, failures to get the money back and to pay Mr. Levine for substantial periods from the entry of the September 23 order … were intentional." (*Id.* at 61:6-11).  In this regard, Judge Gerber emphasized that he "would not enforce contempt if [he] thought there had been a good-faith compliance.  But here there has been nothing close." (*Id.* at 63:17-18).

The Bankruptcy Court discussed the remedies for Appellants' contempt in two parts, addressing the twin goals of ensuring future compliance and compensating for previous delay.  In regards to the former, Judge Gerber allowed a one-week grace period for Fletcher and Richcourt to comply with the specifications of the September 23 Order, after which time a fine (for which Fletcher and Richcourt would be jointly and severally liable) would accrue in the amount of $500 per day.  (Desig. 27 at 62:8-25).  In regards to previous delays in performance and failures to comply, the Court chose, in the exercise of its discretion, not to impose a fine; rather, it ruled that "the failures to comply at the time that the [T]rustee filed most of her papers, and the failures, while lesser, to comply up through today … justify the award of reasonable attorneys' fees [to the Trustee]." (*Id.* at 64:23-65:3).

The Bankruptcy Court memorialized its findings of fact and conclusions of law in an order, dated June 16, 2015, and directed that Appellants, jointly and severally, pay the Trustee's attorneys' fees in the amount of $49,918 as

compensation for expenses incurred in relation to her contempt motion. (Desig. 32 at 11).

## B.    Procedural Background

On September 26, 2014, Fletcher filed a Notice of Appeal to the United States District Court of the Southern District of New York, seeking to appeal the Bankruptcy Court's September 23 Order.  (Counter-Desig. 22).  On appeal, Fletcher claimed error in Judge Gerber's (i) decision to restrain the funds in the Wilmington Account; (ii) rulings concerning Soundview Composite's waiver of the attorney-client privilege, the amount of legal fees owed by Soundview Composite, and the quality of Levine's representation; and (iii) order to Fletcher and Richcourt to provide information regarding disbursements made from the Wilmington Account.  *See In re Sound View Elite Ltd.*, No. 14 Civ. 8615 (GHW), 2015 WL 2166023, at *4 (S.D.N.Y. May 8, 2015).[6]  In a Memorandum Opinion and Order dated May 8, 2015, United States District Judge Gregory H. Woods dismissed Fletcher's appeal for lack of standing.  *Id.* at *5-6.  Fletcher appealed this decision to the United States Court of Appeals for the Second Circuit, but the appeal was dismissed based on Fletcher's failure to file an appellate brief. *See In re Soundview Elite Ltd.*, No. 15-1933 (2d Cir. Oct. 29, 2015).

---

[6]    Fletcher had requested that his contemplated appeal from the contempt decision of Judge Gerber be consolidated with his appeal from the September 23 Order.  Judge Woods denied the application without prejudice to its renewal "if and when a related appeal was filed."  The contempt decision had not issued at the time of Judge Woods' decision.  *See In re Sound View Elite Ltd.*, No. 14 Civ. 8615 (GHW), 2015 WL 2166023, at *4 n.4 (S.D.N.Y. May 8, 2015).

On July 20, 2015, Appellants filed the instant appeal from the Bankruptcy Court's June 16 Order.  (Dkt #1).  Appellants filed their brief in support of their appeal on September 21, 2015.  (Dkt. #7).  The Court noted that Appellants' brief failed to comply with the applicable formatting requirements (*see* Dkt. #8), and consequently directed Appellants to refile an edited brief, which they did on October 5, 2015 (Dkt. #9).  Appellee filed her opposition brief on November 3, 2015 (Dkt. #10), and Appellants concluded the briefing by filing their reply on November 17, 2015 (Dkt. #12).

## DISCUSSION

### A.   Applicable Law

#### 1.   The Standard of Review for Appeals from Bankruptcy Court

The Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a).  A district court reviews a bankruptcy court's findings of fact under a clearly erroneous standard, its conclusions of law *de novo,* and its evidentiary rulings for an abuse of discretion.  *See ASM Capital, LP* v. *Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 582 F.3d 422, 426 (2d Cir. 2009) (findings of fact and conclusions of law); *Automodular Corp.* v. *Delphi Corp.* (*In re Delphi Corp.*), 394 B.R. 342, 344 (S.D.N.Y. 2008) (evidentiary rulings).  "[A] finding is 'clearly erroneous' when" the reviewing court is "left with the definite and firm conviction that a mistake has been made."  *In re Ames Dep't Stores*, 582 F.3d at 426 (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  In general, "[a] ruling is an abuse of discretion only if the bankruptcy court 'bases its ruling on a mistaken application of the law or a clearly erroneous finding of

fact.'"  *Stasko* v. *Motors Liquidation Co.* (*In re Motors Liquidation Co.*), No. 10 Civ. 4322 (JGK), 2011 WL 2462773, at *2 (S.D.N.Y. June 20, 2011) (quoting *Duane Reade, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005)).

A district court "may affirm [the bankruptcy court's decision] on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decision[] below." *Freeman* v. *Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010).  That said, the district court may not consider evidence outside the record below.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008).  Moreover, any argument not raised in the bankruptcy court is considered waived and will not be considered by the district court, unless such a waiver would result in manifest injustice.  *See Klein* v. *Civale & Trovato, Inc.* (*In re Lionel Corp.*), 29 F.3d 88, 92 (2d Cir. 1994); *see also Best Payphones, Inc.* v. *Manhattan Telecomms. Corp.* (*In re Best Payphones, Inc.*), 432 B.R. 46, 60 (S.D.N.Y. 2010), *aff'd*, 450 F. App'x 8 (2d Cir. 2011) (summary order).

Finally, findings of contempt are reviewed for abuse of discretion. *OSRecovery, Inc.* v. *One Groupe Int'l, Inc.*, 462 F.3d 87, 93 (2d Cir. 2006) (citing *Hester Indus., Inc.* v. *Tyson Foods, Inc.*, 160 F.3d 911, 915 (2d Cir. 1998)); *see also In re Solomat Partners, L.P.*, 231 B.R. 149, 151 (B.A.P. 2d Cir. 1999).  This review, however, "is more exacting than under the ordinary abuse-of-discretion standard because a [bankruptcy] court's contempt power is narrowly circumscribed." *Perez* v. *Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003).

### 2.      The Standard for Imposing Civil Contempt Sanctions

A bankruptcy court has the power, pursuant to 11 U.S.C. § 105, to hold parties in civil contempt for violating its own orders.  *In re Nunez*, No. 98 Civ. 7077 (CBA), 2000 WL 655983, at *8 (E.D.N.Y. Mar. 17, 2000) (citation omitted). Finding a party in contempt for failure to comply with a court order requires that "[i] the order the contemnor failed to comply with is clear and unambiguous, [ii] the proof of noncompliance is clear and convincing, and [iii] the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda.* v. *GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King* v. *Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).  "A clear and unambiguous order is one that 'leaves no uncertainty in the minds of those to whom [the order] is addressed.' … Thus, unless the parties can 'ascertain from the four corners of the order precisely what acts are forbidden,' the order cannot form the basis for contempt." *Gucci Am., Inc.* v. *Weixing Li,* 768 F.3d 122, 142-43 (2d Cir. 2014) (quoting *King*, 65 F.3d at 1058).  Violations of a court order need not have been willful, so long as the alleged contemnor failed to exercise "reasonable diligence in attempting compliance." *Matrix Essentials* v. *Quality King Distribs., Inc.*, 346 F. Supp. 2d 384, 390 (E.D.N.Y. 2004) (citation omitted).

Under Rule 65(d), an injunctive order may bind a party's "officers, agents, servants, employees, and attorneys, and … those persons in active concert or participation with them who receive actual notice of the order"; consequently, such non-parties may, under certain circumstances, also be

found in contempt for violating such an order.  Fed. R. Civ. P. 65(d); *see also In re Sledziejowski*, 533 B.R. 408, 423 (Bankr. S.D.N.Y. 2015) (discussing contempt liability for non-parties pursuant to Rule 65).  In order for a court to find a non-party in contempt, that non-party must "either abet the party named in the order, or must be legally identified with him." *People of State of N.Y. by Vacco* v. *Operation Rescue Nat.*, 80 F.3d 64, 70 (2d Cir. 1996) (quoting *Alemite Mfg. Corp.* v. *Staff*, 42 F.2d 832, 833 (2d Cir. 1930)).  Finally, while "persons who cease to act in one of the designated capacities are no longer bound by the decree … an organization and its agents may not circumvent a valid court order merely by making superficial changes in the organization's name or form."  *Id.* (internal citation omitted).

**B.    Analysis**

> **1.    This Court Lacks Jurisdiction over Soundview Composite's Appeal from the Bankruptcy Court's Non-Final Order**

Civil contempt orders against parties to an action are non-final orders; as such, they cannot be immediately appealed absent leave from the court. *OSRecovery, Inc.*, 462 F.3d at 92 ("In general, an order of civil contempt is not 'final' within the meaning of Section 1291 but is interlocutory and therefore may not be appealed until the entry of a final judgment in the underlying litigation.").  This Court lacks jurisdiction over Soundview Composite's appeal, as final judgment has not yet been entered in the underlying adversary proceeding and leave to file an interlocutory appeal has been neither requested nor granted.  *See* 28 U.S.C. § 158(a).

Civil contempt orders against non-parties, however, are immediately appealable, because "the appeal does not interfere with the orderly progress of the main case." *OSRecovery, Inc.*, 462 F.3d at 92 (quoting *Int'l Bus. Machs. Corp.* v. *United States*, 493 F.2d 112, 115 n.1 (2d Cir. 1973)).  The Court therefore considers the merits of the non-party Appellants' arguments regarding the Bankruptcy Court's June 16 Order.[7]

### 2.  Appellants Were Not Excused from Complying with the Bankruptcy Court's Orders Under an Exception to the Collateral Bar Doctrine

As a first line of attack, Appellants argue that no contempt sanctions may lie against them, as they were under no obligation to follow the orders they violated.  (Appellant Br. 20-25).  Specifically, Appellants argue that the Bankruptcy Court's August 8, September 3, and September 23 Orders were "transparently invalid," as they violated Appellants' due process rights.  (*Id.* at 21).  Appellee responds that Appellants received adequate process in the Bankruptcy Court, and, in any event, that Appellants have provided no justification for their failure to seek emergency relief from the purportedly unconstitutional orders.  (Appellee Opp. 35-44).

Due process generally requires that, prior to judicial action being taken against a party, that party receive notice and a meaningful opportunity to be heard.  *See generally Mathews* v. *Eldridge*, 424 U.S. 319, 348 (1976) (describing notice and the opportunity to be heard as "[t]he essence of due

---

[7]    Unless otherwise specified, references to "Appellants" in the remainder of this Opinion are to the non-party Appellants.

process").  Appellants do not here appeal the asset freeze or the ensuing August and September Orders; they appeal instead the June 16 Civil Contempt Order, imposed as a consequence of their failure to comply with the prior orders. Hence, the question before this Court is not specifically one of whether Appellants received adequate process in relation to the Bankruptcy Court's orders, but whether Appellants were justified in violating those orders as a means of expressing their disagreement with the legal proceedings surrounding the freeze of the Wilmington Account.  They were not.

Under the collateral bar doctrine, "a party may not challenge a district court's order by violating it."  *In re Criminal Contempt Proceedings Against Gerald Crawford*, 329 F.3d 131, 138 (2d Cir. 2003) (quoting *United States* v. *Cutler*, 58 F.3d 825, 832 (2d Cir. 1995)).  Pursuant to this doctrine, parties subject to an injunctive order entered by a court with jurisdiction "are expected to obey that decree until it is modified or reversed, *even if they have proper grounds to object to the order*."  *Id.* (quoting *GTE Sylvania, Inc.* v. *Consumers Union of the U.S., Inc.*, 445 U.S. 375, 386 (1980)) (emphasis added); *accord Celotex Corp.*, 514 U.S. at 306.

An exception to the collateral bar doctrine exists where the challenged order "was transparently invalid or exceeded the [issuing court's] jurisdiction." *Cutler*, 58 F.3d at 832; *see also Walker* v. *City of Birmingham*, 388 U.S. 307, 317-21 (1967).  "Even to invoke the 'transparently invalid' exception, however, a defendant must make some good faith effort to seek emergency relief from the appellate court, or show compelling circumstances, such as a need to act

21

immediately, excusing the decision not to seek some kind of emergency relief." *Cutler*, 58 F.3d at 832 (internal quotation marks and citations omitted).

Not all Appellants had the ability to appeal from the Bankruptcy Court's orders.  As Judge Woods recognized in denying Fletcher's appeal, "In addition to satisfying the requirements imposed by Article III of the Constitution, an appellant in a bankruptcy case generally must be 'a person aggrieved — a person directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.'"  *In re Sound View Elite Ltd.*, 2015 WL 2166023, at *4 (citing *In re DBSD N. Am., Inc.*, 634 F.3d 79, 89 (2d Cir. 2011)).  As a practical matter, this left Soundview Composite, the accountholder of the Wilmington Account, as the one Appellant with standing to appeal from the Bankruptcy Court's August 8, September 3, and September 23 Orders.  One could argue that this absence of standing for certain Appellants to appeal from the Bankruptcy Court's orders might constitute a "compelling circumstance" excusing the decision not to seek some kind of emergency relief from an appellate court.  However, Appellants have not advanced such an argument here (or in the Bankruptcy Court, for that matter), and it is not lost on this Court that Soundview Composite did not even attempt such an appeal.

Furthermore, an appeal is not the only form of "emergency relief" available to challenge an order: As another district court in this Circuit has noted, a party may, "at the very least, request[] some clarification or guidance from the Court," and seek to have the order modified.  *United States* v. *Cutler*, 815 F. Supp. 599, 611 (E.D.N.Y. 1993).  While Appellants argued at the

September 3 conference — albeit unconvincingly — that they had belatedly sought clarification of the August 8 Order, they do not suggest (and the record does not reflect) that they made a good-faith effort to clarify or amend the September Orders.  As but one example, the September 23 Order required compliance within two days; counsel for Appellants requested modification of the order after more than four weeks of noncompliance — and only after the filing of Appellee's contempt motion.  (Desig. 27 at 26:22-24).  Appellants fail to argue that they made a good-faith effort to challenge the Bankruptcy Court's orders before that court; they cannot now seek to defend their disobedience by characterizing those orders as "transparently invalid."

Moreover, even were the Court to conclude that Appellants were excused from their obligation to undertake a good-faith effort to seek emergency relief, they would still be subject to the collateral bar doctrine.  Appellants claim that the Bankruptcy Court's orders were so lacking in due process as to be "transparently invalid," thereby justifying their violations.  (*See* Appellant Br. 22-25).  Specifically, they assert that (i) Richcourt received neither notice nor opportunity to be heard in regards to the September Orders; (ii) Fletcher did not receive a "meaningful" opportunity to be heard regarding the September 3 Order; and (iii) the September 23 Order requested information not specifically contemplated by the September 3 Order.  (Appellants Br. 23-25).[8]  None of these arguments succeeds.

---

[8]     Appellants also argue that SCM received insufficient notice and opportunity to be heard.  However, SCM is not a party to this appeal, and Appellants have made no argument regarding why they should be allowed third-party standing to assert any

Fletcher, a director of Richcourt, was present at the August 8 and September 3 conferences, thus providing Richcourt with notice of the ensuing September 3 and 23 Orders.  (*See* Desig. 9 at 4:12; Desig. 14 at 5:3).  *See Baker* v. *Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation." (citation omitted)).  Richcourt's knowledge, through Fletcher, of the September 3 conference additionally indicates that it had an opportunity to be heard, of which it chose not to avail itself; that Richcourt opted not to send a representative does not negate its opportunity to do so.  *See, e.g.*, *Ocean Warehousing B.V.* v. *Baron Metals & Alloys, Inc.,* 157 F. Supp. 2d 245, 250 (S.D.N.Y. 2001) (corporation's failure to appear at a confirmation of arbitration hearing did not deprive corporation of due process).  As to Fletcher, not only did he receive an "opportunity to be heard" at the September 3 conference, but Judge Gerber went out of his way to extract responses from Fletcher when he refused to provide clear answers to the judge's questions.  (*See* Desig. 14 at 32:9-36:22 (Fletcher concluding his extensive remarks to Judge Gerber with, "So I have nothing further to say, and we will gladly comply with — we'll certainly comply with whatever Your Honor tells us to do."), 36:23-40:23 (colloquy between Judge Gerber and Fletcher, concluding with Judge Gerber asking, "Anything further from you, Mr. Fletcher, before I give others a chance to reply?," to which Fletcher answered,

---

possible violation of SCM's due process rights.  *See, e.g., Ctr. for Reprod. Law & Policy* v. *Bush*, 304 F.3d 183, 196 (2d Cir. 2002) ("Plaintiffs cannot make their ... claims actionable merely by attaching them to a third party's due process interests.").

"Not at this time, Your Honor.")).  Finally, regarding the September 23 Order, Judge Gerber expressly stated on September 3 that he would "so order the record," but that he "want[ed] a written order *to supersede it*," thereby foreshadowing that the written order might not be identical to the conference transcript.  (*Id.* at 52:12-13 (emphasis added)).  More to the point, the September 23 Order merely spelled out what had been plainly requested in the September 3 Order — namely, a detailed accounting of financial transfers to and from Richcourt.  (*Compare id.* at 40:13-17, *with* Desig. 19 at 11 ¶ 9).  In sum, Appellants' proffered due process violations fall far short of establishing the Bankruptcy Court's orders as "transparently invalid."

The Court notes that an order's arguable invalidity is not sufficient, on its own, to except a party from the collateral bar doctrine.  *In re Criminal Contempt Proceedings Against Gerald Crawford*, 329 F.3d at 138; *see also Matter of Providence Journal Co.*, 820 F.2d 1342, 1347-48 (1st Cir. 1986) ("[I]f the court reviewing the order finds the order to have had *any preten[s]e* to validity at the time it was issued, the reviewing court should enforce the collateral bar rule.  Such a heavy presumption in favor of validity is necessary to protect the rightful power of the courts." (emphasis added)), *opinion modified on reh'g*, 820 F.2d 1354 (1st Cir. 1987).  Were the law otherwise, the exception would swallow the rule, and courts of appeals would largely be out of a job; litigants would effectively become their own private appeals courts, deciding when a ruling does or does not warrant compliance.  This Court does not foreclose the possibility that circumstances might arise under which an order's

violation of due process was so blatantly egregious and prejudicial as to render it "transparently invalid," and thus to justify challenge through disobedience. This case presents no such circumstance.

The record indicates that the parties were given ample notice of the August 8, September 3, and September 23 Orders, as well as sufficient opportunity to be heard.  Accordingly, the record belies Appellants' characterization of the orders as so "transparently invalid" that they could simply opt out of compliance.

### 3. The Bankruptcy Court Did Not Abuse Its Discretion When It Imposed Sanctions on Appellants for Civil Contempt

Appellants argue that, even if they were in fact bound by the Bankruptcy Court's August 8, September 3, and September 23 Orders, the Bankruptcy Court erred in finding Appellants in contempt because (i) the August 8 Order was ambiguous; (ii) Appellants made reasonably diligent efforts to comply; (iii) the factual record was insufficient to support a finding of contempt in regard to the non-parties; and (iv) the court improperly held Appellants jointly and severally liable.  (Appellant Br. 26-42).  The arguments are analyzed, and rejected, in the remainder of this section.

### a. The Bankruptcy Court's August 8 Order Was Not Ambiguous

The Bankruptcy Court found "as a fact or mixed question of fact and law that there was nothing ambiguous, what[so]ever, with respect to [its August 8] order." (Desig. 14 at 46:22-24).  When a case comes to a court on appeal, "deferential review of mixed questions of law and fact is warranted when it

appears that the [lower] court is 'better positioned' than the appellate court to decide the issue in question." *Salve Regina Coll.* v. *Russell*, 499 U.S. 225, 233 (1991).  In the present matter, the Court considers the Bankruptcy Court better positioned to assess the ambiguity of its August 8 Order, given that the "order" in question consists of the transcript of a conference, the tone and general circumstances of which the Bankruptcy Court necessarily has greater knowledge.  Hence, a deferential standard of review for the Bankruptcy Court's determination regarding the clarity of its August 8 Order is warranted.  *Cf. In re Old Carco LLC*, 438 F. App'x 30 (2d Cir. 2011) (summary order) ("The bankruptcy court that entered the Enforcement Order is the same court that entered the Sale and Rejection Orders.  That court is best situated to interpret the Orders; we give its interpretation substantial deference.").  The Court notes, however, that whether it reviews the Bankruptcy Court's findings deferentially or considers the August 8 Order *de novo* does not matter, as it reaches the same result under either standard.

Appellants argue that the August 8 Order did "*not* clearly indicate that the Court had ordered any payment of legal fees from the $100,000 released from the Wilmington Trust Account," but that "the Bankruptcy Court merely stated that the $100,000 released from [the Account] 'could be used and should be used to pay the legal expenses that are under discussion here, to meet the SEC's legitimate investigatory needs," and that the Court additionally had "*no objection*" to additionally paying Levine from that $100,000.  (Appellant Br. 27-28 (emphasis in original)).  In other words, Appellants argue, use of the

disbursed funds to pay Sher Tremonte and Levine was merely a *suggested* use. This reading of the August 8 Order beggars logic.

At the conclusion of the August 8 hearing, the Bankruptcy Court — in accordance with the parties' preference — so-ordered the record of that conference rather than publish a separate written order. (Desig. 9 at 39:12-19). Thus, the meaning of the "Order" at issue cannot be discerned from a single page of the transcript, but must be considered in light of the entire proceeding (as Appellants apparently concede, given the gloss they seek to impart on Judge Gerber's comments (*see* Appellant Br. 27)). Here, Judge Gerber opened the proceedings by stating, in no uncertain terms: "we're here on the conference requested by Mr. Levine vis-à-vis additional draws from Soundview Composite *for what I believe were the two specific purposes* he was talking about: one for Sher Tremonte for assistance in connection with a subpoena to Fletcher Asset Management, and also his own fees." (Desig. 9 at 5:4-8 (emphasis added)). Nothing stated during the remainder of the conference — either by Judge Gerber or the parties — suggested any use of the $100,000 funds other than those two purposes set forth at the outset of the proceeding.

Appellants latch onto the Bankruptcy Court's use of the words "could" and "should" as imparting some ambiguity to the August 8 Order; and perhaps, under different circumstances, the Court's phrasing would be grounds for uncertainty as the permissible use of the disbursed funds. Under the present circumstances, however, no such ambiguity existed. Rather, Judge Gerber's

28

use of "could" and "should" was the natural result of the posture of the proceedings:  (i) Levine requested that funds be disbursed for two specific purposes; (ii) the Bankruptcy Court expressed some misgivings about disbursing the funds for the requested uses; (iii) counsel for both parties provided reasons why the disbursement was appropriate; and (iv) the Court ultimately agreed that the parties had presented compelling reasons why the money "could" and "should" be used in the requested manner, and therefore approved the disbursement.  In other words, the Court's decision to disburse the funds was clearly predicated on its acceptance of the parties' arguments regarding the propriety of the specifically requested uses; no reasonable party could have believed, following the August 8 conference, that the disbursed funds could permissibly be spent in any manner other than the two under discussion during that proceeding.[9]

---

[9]    Though not citing it directly in the portion of their brief regarding the August 8 Order's purported "ambiguity," Appellants allude to Judge Gerber's statement that "[e]xcept for my willingness to allow the 100,000 dollars to be paid on account of the creditor obligation — and I understand that the creditor obligation is to Fletcher entities; it is to insiders — the restraints otherwise remain in place" (Desig. 9 at 39:7-10) as creating a "plausibl[e]" interpretation that "the $100,000 released … to *SCM* was separate and distinct from the $100,000 requested by *Soundview Composite* to pay Levine and Sher Tremonte," and therefore the disbursement could be used however Appellants saw fit (Appellant Br. 28 (emphasis in original)).  There is nothing "plausible" about this interpretation of the record.  The purpose of the conference was to discuss Appellants' own request to disburse $100,000 for two specified uses.  Judge Gerber expressed some discomfort with disbursing funds to Soundview Composite to retain counsel for SCM, prompting the Trustee to note SCM's existing claim against Soundview Composite as a means of allaying Judge Gerber's concerns over using Composite funds to retain SCM's counsel.  (*See, e.g.*, Desig. 9 at 37.)  As for paying Levine from the funds disbursed pursuant to SCM's claim, Judge Gerber specifically explained that he had "no objection to paying Mr. Levine from that 100,000 dollars for work he previously did, so long as it's understood that this is a credit against amounts that would otherwise be on account of the obligation for which they're being paid."  (*Id.* at 38:25-39:4).

In other words, all discussion of paying out SCM's claim against Soundview Composite was unquestionably in the context of justifying the disbursement of funds for the two specifically requested purposes.  For Appellants to ignore the rest of the conference and

Had the Bankruptcy Court reduced the August 8 hearing to a written order, interpreting the August 8 Order would be quicker, insofar as it would not be necessary to look through an entire transcript; no writing is needed, however, to ascertain the clear meaning of that order.  Levine requested a disbursement of $50,000 for retaining SCM's SEC counsel, and $50,000 for payment of his own fees.  A conference was held on that request, and that request was granted.  Appellants' argument that the Bankruptcy Court's word choice reasonably suggested they could use those funds however they pleased is plainly contradicted by the record.  However, for the sake of clarity, this Court finds as follows: The August 8 Order was not ambiguous.

> ### b. The Bankruptcy Court's Findings of Fact Regarding the Remaining Prongs of the Civil Contempt Standard Were Not Clearly Erroneous

The Bankruptcy Court found that Appellants had failed to comply with its order, and had failed to exercise "reasonable diligence" in so failing.  The record easily supports these findings, and certainly does not suggest clear error in them.

Noncompliance with Judge Gerber's orders cannot seriously be disputed, and presumably for this reason Appellants focus on the ambiguity and reasonable diligence prongs of the civil contempt standard.  As to the latter, Appellants argue first that they made reasonably diligent efforts to comply with the Bankruptcy Court's August 8 Order.  At base, however, this argument is a

---

now proffer Judge Gerber's single comment, stripped of all context, as suggesting that the Bankruptcy Court plausibly intended the $100,000 from the Wilmington Account to be personal spending money for SCM insiders is simply misleading.

second bite at the ambiguity apple: If and to the extent that the Bankruptcy

Court's orders were not ambiguous, then Appellants' conduct cannot fairly be

described as reasonably diligent.  As discussed *supra*, the August 8 Order

unambiguously required that the $100,000 disbursed from the Wilmington

Account be used for two specific purposes.  The money was not used for those

specified purposes.  Appellants therefore cannot credibly claim that they made

"reasonably diligent" efforts to comply.  Contrary to Appellants' argument, the

fact that they returned the misspent funds — *after* their violation had been

discovered and Appellee had clearly reserved her right to move for contempt

sanctions — does not transform their earlier disregard of the order into

reasonably diligent or "substantial" compliance.

Considering next the related requirements of the September 3 and

September 23 Orders, Appellants argue that they ultimately made the required

$50,000 payment to Levine and returned the balance of the $100,000

disbursement as directed.  (Appellant Br. 31).  Appellee does not contend

otherwise.  Rather, it argues that Appellant failed to *timely* comply with the

September Orders — indeed, full compliance did not occur until after Judge

Gerber found appellants in contempt and imposed a daily accruing fine.

(Appellee Opp. 45-48).

Appellants do not dispute the untimeliness of their payment to Levine

and their return of funds to the Wilmington Account.  Instead, in regards to the

information sought by the September 23 Order, Appellants argue that Fletcher

had "a reasonable, good faith belief that the September 4 Accounting was

sufficient to comply with the order," and that his September 2 letter "provided sufficient evidence" that Sher Tremonte had been paid.  (Appellant Br. 32).  These arguments border on bad faith.

On September 3, 2014, the Bankruptcy Court stated: "I'm going to so order the record today, but I want a written order to supersede it."  (Desig. 14 at 52:11-13).[10]  The September 23 Order stated, on its face, "Richcourt or Alphonse Fletcher, Jr. or both shall within two days of the entry of this Order *supplement the list of expenditures provided by Alphonse Fletcher, Jr. on September 4, 2014* with the [additional specified] information."  (Desig. 19 at 11 ¶ 9 (emphasis added)).  How Appellants can now represent that Fletcher had a "reasonable, good faith belief" that his September 4 accounting — the accounting specifically required to be "supplement[ed]" with additional information — sufficed to satisfy the September 23 Order is beyond the Court's comprehension.

Similarly, the September 23 Order directed Soundview Composite and/or Richcourt to provide, within two days of the entry of that Order, "objective evidence of the purported $25,000 payment to the Sher Tremonte firm, as stated in the list of expenditures provided by Alphonse Fletcher, Jr. on September 4, 2014."  (Desig. 19 at 10 ¶ 3).  Fletcher's September 2 letter states that Composite "'retained and delivered a retainer to SEC counsel' to address

---

[10]     On this issue, it bears noting that Appellants' repeated contentions in their brief that the information required by the September 23 Order was not included in the September 3 Order miss the mark: The contempt sanctions were imposed only for conduct that post-dated, and clearly violated, each of the Bankruptcy Court's orders.

the S.E.C. subpoena for additional information about the affairs of Composite and its affiliates." (Desig. 13).  No reasonable person, let alone a sophisticated businessperson, could believe this bare assertion satisfied the subsequent request for "objective evidence" that a retainer had been paid.  Significantly, the order to produce objective evidence was made *after* Fletcher's September 2 representation, and was a consequence of Appellee's expressed concern that the September 2 letter had failed to state the amount paid to Sher Tremonte and "[was], itself, a deception." (Desig. 14 at 44:16-18).  For Appellants to contend that Fletcher had a "reasonable, good faith belief" that his September 2 letter satisfied the subsequent request for production of objective evidence is, to quote Judge Gerber, "mind-boggling." (*Id.* at 39:9).  As with the August 8 Order, the record provides ample support for the Bankruptcy Court's finding of a failure to exercise reasonably diligent efforts to comply with its September 3 and 23 Orders, and certainly no suggestion that such a finding was "clearly erroneous."

Finally, Appellants contend that the Bankruptcy Court lacked a sufficient factual basis for holding the non-parties in contempt.  (Appellant Br. 32).  To be liable for civil contempt, the non-parties must have known of the violated orders; constitute the party's "officers, agents, servants, employees, [or] attorneys"; and "either abet the party named in the order, or [] be legally identified with [it]." *Vacco*, 80 F.3d at 70 (citation omitted).  Appellants contest only the third prong, arguing that they made no "affirmative acts" in furtherance of Soundview Composite's purported violation of the Bankruptcy

33

Court's orders, and consequently cannot be found in contempt. (Appellant Br. 33-38). The Bankruptcy Court found otherwise, and its findings are neither clearly erroneous nor wholly lacking in foundation.

Richcourt accepted funds from the Wilmington Account, and proceeded to disburse them for purposes other than the two explicitly authorized by the Bankruptcy Court's August 8 Order. That Richcourt requested funds from the Wilmington Account prior to August 8 is beside the point; its disbursement of the $100,000 undisputedly came after that date. Furthermore, an entity can only act through its individual agents; and in Richcourt's case, such agents include its director, Fletcher. The September 3 and 23 Orders both directed "Richcourt and Fletcher or both" to provide a detailed and timely accounting, and the Bankruptcy Court could reasonably have found that in failing to do so, Fletcher was acting in his capacity as Richcourt's director. Hence, the record supports a finding that Richcourt aided and abetted Soundview Composite's contempt of court orders.

Fletcher, for his part, owned and controlled both Soundview Composite and Richcourt, and thus controlled Richcourt's disbursement of funds for purposes other than those authorized by the Bankruptcy Court; he obfuscated facts about how the $100,000 from the Wilmington Account was spent; and he failed to provide accounting information as expressly ordered by the Bankruptcy Court. The Bankruptcy Court's finding that he abetted Soundview Composite's contempt was far from clearly erroneous; indeed, the record strongly suggests that he played a primary role.

Turning to Ladner and Saunders, the Court acknowledges that the record includes less information about their participation in the violation of the Bankruptcy Court's orders. Nevertheless, it provides ample support for Judge Gerber's ultimate findings that Ladner and Saunders abetted contempt. Ladner, like Fletcher, served as a director of both Soundview Composite and Richcourt. While not himself present at the August 8 hearing, Ladner had specifically directed Levine to request $50,000 to pay a retainer to Sher Tremonte (Desig. 15 at Ex. 9), and he was subsequently copied on emails discussing the August 8 Order (*see id.* at Ex. 8). *See generally Mister Softee, Inc.* v. *Tsirkos*, No. 14 Civ. 1975 (LTS) (RLE), 2014 WL 2971106, at *4 (S.D.N.Y. July 2, 2014) ("Both a contemnor and his counsel 'have a duty to monitor the progress of the litigation and to ascertain the terms of any order entered against the party. Unexcused failure to do so may justify a finding of contempt when the party knows that some order has been entered against him.'" (quoting *Perfect Fit Indus., Inc.* v. *Acme Quilting Co., Inc.*, 646 F.2d 800, 808 (2d Cir. 1981))). Ladner nevertheless approved the posting of $15,000 in bonds on behalf of Fletcher and Turner in a proceeding before Judge Pauley (*see* Desig. 15 at Ex. 6); moreover, he personally received $5,000 from the $100,000 disbursed by the Wilmington Account, and was then present at the September 3 conference, during which those funds were ordered to be returned (*see* Desig. 14 at 5:4). Even then, the funds in question were not reported as having been returned to the Wilmington Account until nearly two months later, on or about October 30, 2014. (Desig. 26 at 1). Because Ladner approved the

improper disbursement of funds, and delayed in returning funds to which he knew he was not entitled, the Bankruptcy Court did not err in finding that he acted contrary to the September 3 Order.

Turning finally to Saunders, he affirmed, in a sworn affidavit submitted to the Bankruptcy Court, that "Levine stated to me that what Judge Gerber did was release $100,000 that [Soundview Composite] owed to [SCM] and SCM was free to do whatever it wanted to do with that money." (Desig. 15 at Ex. 6). The statement is problematic on multiple levels. As an initial matter, Saunders was present at the August 8 conference (*see* Desig. 9 at 9:13-14); consequently, regardless of Levine's subsequent representations, Saunders (an attorney licensed to practice in the State of New York) could not reasonably have understood Judge Gerber's August 8 Order in that manner. Furthermore, Saunders participated in a lengthy phone call during which Levine was told to request funds from the Wilmington Account for the specific purpose of retaining SEC counsel for SCM. (Desig. 14 at 21:7-16). And in any event, the record indicates that Levine clearly understood the $100,000 to be spent for two specific purposes — one being his own fees — and he vigorously denied to the Bankruptcy Court Saunders' contention that he ever represented otherwise. (Desig. 15 at Doc. 2). Given these facts, the Bankruptcy Judge could reasonably have found that Saunders affirmatively lied in an attempt to conceal or justify the misuse of the funds disbursed pursuant to the August 8 Order. Saunders additionally personally received at least $5,000 of those funds and, as with Ladner, the record suggests that those funds were not

returned to the Wilmington Account until nearly two months after they were ordered to be returned.  Thus Appellants' argument that there was an "insufficient factual record" from which Judge Gerber could have found Saunders in contempt fails.

In sum, the record contains sufficient factual information for the Bankruptcy Judge to have determined that Appellants each satisfied the requirements for civil contempt liability.  This Court sees no basis to disturb those findings.

### c. The Bankruptcy Court Had Sufficient Legal Basis to Impose Attorneys' Fees as a Sanction for Appellants' Civil Contempt

"It is basic law that a civil contempt sanction … may not be punitive," *Gucci Am., Inc.*, 768 F.3d at 144 (citation omitted), but must rather be designed either to "coerce future compliance or to remedy any harm caused by noncompliance," *F.T.C.* v. *BlueHippo Funding, LLC*, 762 F.3d 238, 243 (2d Cir. 2014) (internal quotation marks omitted).  Appellants argue that the sanction imposed on them was not compensatory, but was rather "purely punitive and, as such, an abuse of the Bankruptcy Court's discretion."  (Appellant Br. 40). Once again, Appellants' argument is refuted by the record.

The Bankruptcy Court found that "the failures to comply with the order from August and September, three of them all [told], have resulted in an extraordinary expense to the estate."  (Desig. 27 at 35:15-17).  Judge Gerber expressly recognized that the intent of contempt sanctions is "not to penalize people," and went on to state that he would *not* decide "whether any fine for the

37

past failures to comply would be necessary or appropriate because, in the exercise of [his] discretion, [he was] not imposing anything of that character." (*Id.* at 64:18-22).  Rather, he ruled that "the payment of the [T]rustee's reasonable attorney's fees" was justified to compensate the Trustee for expenses incurred as a result of Appellants' deliberate delinquency.  (*Id.* at 64:22-25).  In accordance with that ruling, the June 16 Order states:

> Pursuant to the Court's directive, counsel for the Trustee and counsel for Respondents met and conferred regarding the amount for the … award of attorneys' fees to be paid to the Trustee, and *agreed that the Trustee had incurred $49,918 in attorneys' fees* in connection with her motion for contempt.  Accordingly, Respondents are ordered to pay to the Trustee the amount of $49,918 *as reimbursement* for her attorneys' fees…

(Desig. 32 at 11 (emphasis added)).  In other words, the sanction imposed was no more than required to make the Trustee whole; it most certainly cannot be characterized as "purely punitive."

The Second Circuit has stated that "it is appropriate for the court … to award the reasonable costs of prosecuting … contempt, including attorney's fees, if the violation of the decree is found to have been willful."  *Canterbury Belts Ltd.* v. *Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir. 1989) (quoting *Vuitton et Fils S.A.* v. *Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979)).[11]

---

[11]    The Court also observes that in both the cases Appellants cite for the proposition that awarding attorneys' fees in a contempt context requires willfulness, the courts had already imposed sanctions in the form of disgorgement of profits; hence, absent a finding of willfulness, the *additional* imposition of attorneys' fees would indeed tend toward the punitive.  (*See* Appellant Br. 39 (citing *Manhattan Indus., Inc.* v. *Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir. 1989), and *GMA Accessories, Inc.* v. *Eminent, Inc.*, No. 07 Civ. 3219 (LTS) (DF), 2008 WL 2355826, at *8 (S.D.N.Y. May 29, 2008))).  Here,

The Bankruptcy Court explicitly found that Appellants' "failures to comply with the [September 23 Order] and the delays associated with [that] order, failures to get the money back and to pay Mr. Levine for substantial periods from the entry of the September 23rd order ... were intentional." (Desig. 27 at 61:7-11). Appellants have presented no compelling argument that the Bankruptcy Court's finding in this regard was clearly erroneous[12]; this Court therefore will not disturb it, and finds that the Bankruptcy Court's awarding of the Trustee's attorneys' fees associated with her contempt motion was generous to Appellants, and well within that Court's discretion.

### d. The Bankruptcy Court's Imposition of Joint and Several Liability on Appellants Was Not an Abuse of Discretion

Finally, Appellants challenge the imposition of attorneys' fees on a joint and several basis. In allocating liability for attorneys' fees, the deciding court has broad discretion. *Koster* v. *Perales*, 903 F.2d 131, 139 (2d Cir. 1990), *partially abrogated on other grounds by Buckhannon Bd. and Care Home, Inc.* v. *W. Va. Dep't of Health and Human Resources*, 532 U.S. 598 (2001). Specifically, a court imposing fees

> "may allocate the fee award between the responsible parties, ... or it may hold the responsible parties jointly and severally liable for the fee award. The only limitation [on joint and several liability] is ... the pre-existing background of substantive liability rules." The court "should 'make every effort to achieve the most fair and sensible solution that is possible.'" Accordingly,

---

by contrast, the cost of prosecuting the contempt proceeding was the only sanction imposed.

[12] Appellants' terse argument to this Court comprises a conclusory statement that their actions "were not willful," and a reference to "reasonable efforts" to comply that this Court has already rejected. (Appellant Br. 39-40).

> "although apportionment may in some cases be a more equitable solution, there is no rule in this circuit that requires it whenever possible."

*Rubenstein* v. *Adv. Equities, Inc.*, No. 13 Civ. 1502 (PGG), 2015 WL 585561, at *9 (S.D.N.Y. Feb. 10, 2015) (quoting *Koster*, 903 F.2d at 139) (internal citations omitted).

Appellants argue that according to at least one court, a "lack of willfulness militates against requiring [a party] to be responsible for the full measure of fees," and that an examination of the record shows no willfulness on the part of Appellants.  (Appellant Br. 41-42 (quoting *Miroglio S.P.A.* v. *Conway Stores, Inc.*, 629 F. Supp. 2d 307, 317 (S.D.N.Y. 2009))).  They additionally contend that "[t]he record shows that the Bankruptcy Court made *no* effort to 'achieve the most fair and sensible solution possible.'"  (*Id.* at 42 (quoting *Rubenstein*, 2015 WL 585561, at *9)) (emphasis in brief).

First, the Bankruptcy Court found that Appellants had acted intentionally in violating that Court's order, and as this Court has already discussed, it will not disturb that finding.  Second, Appellants' reliance on *Miroglio* as requiring willfulness for imposing joint and several liability is misplaced: That case specifically notes that not all courts within the Second Circuit have adopted such a rule, explaining that "[t]he Second Circuit has squarely held that it is within the trial court's discretion to determine whether the defendants will be jointly and severally liable for attorney's fees."  *Miroglio*, 629 F. Supp. 2d at 316.

Third, and finally, Appellants' contention that the Bankruptcy Court completely failed to explain its apportionment of liability is belied by the record: Judge Gerber stated at the November 6 hearing "that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.  See, for example, Celotex Corp. v. Edwards, 514 U.S. at 306." (Desig. 27 at 60:19-23).  He went on to state that, "turning to remedy for past failures to comply, again, all in the context of the Celotex principle … all parties who were originally subject to the order are jointly and severally liable." (*Id.* at 64:6-9).[13]  Hence, the Bankruptcy Court plainly found that *Celotex* prohibits challenging an order through violation, and that Appellants nevertheless did precisely that.  The Bankruptcy Court specifically noted the "substantial delay in performance with respect to the great bulk of the requirements of the earlier orders, including, most significantly, the duties to pay or pay back the sums that were the subject of the earlier orders," and, further, that "there was no performance at all of [the order to provide additional accounting information]."  (*Id.* at 64:11-17).

Both Ladner and Saunders personally received funds from the $100,000 disbursement, and consequently contributed to the delayed repayment.  Both Richcourt and Fletcher were directed by the September 23 Order to provide

---

[13]     Appellants emphasize the word "parties" in Judge Gerber's order, suggesting that the non-party Appellants should therefore be found either not liable, or less culpable than Soundview Composite.  (Appellant Br. 41).  In so doing, Appellants ignore the rest of the sentence:  Judge Gerber uses the word "parties" to refer not to the parties to the adversary proceeding, but to all individuals or entities who were subject to his previous orders — which, under Rule 65(d), includes the non-party Appellants.

specific accounting information, and neither complied until substantial monetary sanctions were imminent.  All three of the individual Appellants are sophisticated businesspeople, intimately involved with the entities in question.  Richcourt controlled the improperly disbursed funds.  None of the Appellants was blameless.  To the contrary, in light of the interdependence of the Appellants, and their repeated efforts to obfuscate the facts during the bankruptcy court proceedings, this Court cannot fault the Bankruptcy Court for declining to parse precisely how liability should be allocated between the culpable parties.  In sum, the Bankruptcy Court's decision to impose liability for attorneys' fees jointly and severally was not an abuse of discretion.

## CONCLUSION

For the reasons stated in this Opinion, Soundview Composite's appeal from the Bankruptcy Court's June 16 Order is DISMISSED for lack of jurisdiction.  In regards to the remaining Appellants, the Bankruptcy Court's June 16 Order is AFFIRMED, and the appeal from that Order is DENIED.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      March 23, 2016
            New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

42